**BEFORE THE UNITED STATES**
**JUDICIAL PANEL ON MULTI-DISTRICT LITIGATION**

In Re:

FACEBOOK USER PROFILE LITIGATION

MDL No. 2843

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S SUBSEQUENT MOTION FOR TRANSFER OF ACTIONS TO THE SOUTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1407**

W. Craft Hughes
Jarrett L. Ellzey
**HUGHES ELLZEY, LLP**
2700 Post Oak Blvd., Suite 1120
Galleria Tower I
Houston, TX 77056
Phone: (713) 322-6387
Fax: (888) 995-3335
craft@hughesellzey.com
jarrett@hughesellzey.com

ATTORNEYS FOR PLAINTIFF
MATTHEW LODOWSKI

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 1

III. LEGAL STANDARD ..... 6

IV. ARGUMENT ..... 6

- A. The Litigation Satisfies the Requirements for Coordination or Consolidation and Transfer Under 28 U.S.C. § 1407 ..... 6
- B. The Litigation Involves Common Questions of Fact ..... 7
- C. Transfer Will Promote the Just and Efficient Conduct of Related Actions ..... 7
- D. Texas is the Most Appropriate Forum ..... 8

V. CONCLUSION & PRAYER ..... 9

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Am. Family Mut. Ins. Co. Overtime Pay Litig.*
416 F. Supp. 2d 1346, 1347 (J.P.M.L. 2006)....................8

*In re Auto Body Shop*,
2014 WL 3908000 (J.P.M.L. 2014)....................7, 8

*In re Enfamil Lipil*,
764 F. Supp. 2d 1356, 1357 (J.P.M.L. 2011)....................8

*In re Foundry Resins*,
342 F. Supp. 2d 1346 (J.P.M.L. 2004)....................7

*In re Natrol, Inc. Glucosamine/Chondroitin*,
2014 WL 2616783 (J.P.M.L. 2014)....................8

*In re Plumbing Fixtures*,
308 F. Supp. 242, 244 (J.P.M.L 1970)....................7

*In re: Sigg Switzerland (USA), Inc., Aluminum Bottles Mktg. & Sales Practices Litig.*,
682 F. Supp. 2d 1347, 1349 (J.P.M.L. 2010)....................9

## Statutes

28 U.S.C. § 1407....................1, 6, 7

## Rules

JPML Rule 6.2....................1

## I. INTRODUCTION

Pursuant to 28 U.S.C. § 1407 and JPML Rule 6.2, Matthew Lodowski, plaintiff in the case styled *Lodowski v. Facebook, Inc.*, U.S. District Court for the Southern District of Texas, Case No. 4:18-cv-00907, respectfully moves for an Order transferring the eight pending cases listed in the Schedule of Actions filed concurrently herewith (collectively, "the Actions"), as well as any tag-along cases subsequently filed involving similar facts or claims, to the U.S. District Court for the Southern District of Texas for coordination or consolidation. The Actions satisfy the requirements for consolidation and transfer pursuant to Section 1407, and for the reasons discussed below, the Southern District of Texas is the appropriate Transferee Court.

## II. BACKGROUND

On March 18, 2018, the Guardian published a report on Cambridge Analytica ("CA") bringing to light a data harvesting scheme that compromised the personal data of over 50 million Facebook users.[1] The report explained how CA, with the help of Cambridge University professor ALEKSANDR KOGAN and the financial backing of ROBERT LEROY MERCER, developed a scheme to surreptitiously collect millions of Facebook users' data for the purpose of developing psychographic profiles and manipulating voter behavior in United States elections.[2] Additionally, the report explained that Facebook, Inc., upon learning of the issue, took minimal action to address the data breach and failed to notify its users that their data had been seized and shared.[3]

The Guardian's report triggered investigations in the United Kingdom, the United States,

---

[1] *See* Carole Cadwalladr, " 'I made Steve Bannon's psychological warfare tool': meet the data war whistleblower," *The Guardian* (March 18, 2018), https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.

[2] *Id*.

[3] *Id*.

and numerous private suits. The private suits break into two types: shareholder suits and user class actions. This suit, brought by plaintiff MATTHEW LODOWSKI, individually and on behalf of all others similarly situated, is a user class action alleging a civil conspiracy between CAMBRIDGE ANALYTICA, ALEKSANDR KOGAN, and ROBERT LEROY MERCER to collect user data in violation of the Stored Communications Act and a negligent failure to secure and protect user data by FACEBOOK, INC.

Christopher Wylie, a whistleblower, informed The Guardian's March 18, 2018 report.[4] Wylie had personal knowledge of Defendants' actions because he worked at CA and was a lead engineer in the project.[5] According to the report, CA worked with ALEKSANDR KOGAN to surreptitiously collect Facebook users' data on a massive scale. ALEKSANDR KOGAN was essential to the scheme because Facebook authorized him to collect user data for research purposes as an academic.[6] This access allowed him to distribute his personality test to Facebook users, who unwittingly gave Kogan access to their personal data as well as their friends' personal data:

> "…he advertised for people who were willing to be paid to take a personality quiz on Amazon's Mechanical Turk and Qualtrics. At the end of which Kogan's app, called thisismydigitallife, gave him permission to access their Facebook profiles. And not just theirs, but their friends' too. On average, each 'seeder' – the people who had taken the personality test, around 320,000 in total – unwittingly gave access to at least 160 other people's profiles, none of whom would have known or had reason to suspect."[7]

---

[4] *Id*.

[5] *See* Carole Cadwalladr, " 'I made Steve Bannon's psychological warfare tool': meet the data war whistleblower," *The Guardian* (March 18, 2018), https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.

[6] *Id*.

[7] *Id*.

This scheme allowed Kogan to collect, "millions of profiles in a matter of weeks."[8] In doing so, Kogan exceeded the permission granted him by users and Facebook alike: on the one hand, Kogan exceeded the authorization granted him by users who took his personality test by collecting data from their friends—millions of additional users—who had not given Kogan their consent; and on the other hand Kogan exceeded the authorization granted him by Facebook, which gave him permission to pull Facebook data, "but for academic purposes only."[9]

Wylie told the Guardian, "He has receipts showing that CA spent $7m to amass this data, about $1m of it with [Global Science Research]."[10] Global Science Research (GSR) was a company owned by ALEKSANDR KOGAN, "specifically premised on the harvesting of Facebook data, so that it could be matched to personality traits and voter rolls."[11] GSR was dissolved on October 31, 2017.[12] CA received its funding from Defendant ROBERT LEROY MERCER, who met with CA CEO Alexander Nix and Christopher Wylie in New York to discuss the plan.[13] Wylie told the Guardian about that meeting, stating, "'In politics, the money man is usually the dumbest person in the room. Whereas it's the opposite way around with Mercer,' says

---

[8] *Id*.

[9] *Id*.

[10] *See* Carole Cadwalladr, " 'I made Steve Bannon's psychological warfare tool': meet the data war whistleblower," *The Guardian* (March 18, 2018), https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.

[11] *Id*.

[12] "Global Science Research: Filing History," Companies House (last searched March 29, 2018), https://beta.companieshouse.gov.uk/company/09060785/filing-history

[13] *See* Carole Cadwalladr, " 'I made Steve Bannon's psychological warfare tool': meet the data war whistleblower," *The Guardian* (March 18, 2018), https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.

Wylie. 'He said very little, but he really listened. He wanted to understand the science. And he wanted proof that it worked.'"[14]

On March 28, 2018, Christopher Wylie testified before Parliament in the United Kingdom, where he explained that CA was a company designed to serve ROBERT LEROY MERCER's personal political goals, stating, "you have to remember part of the brilliance of Cambridge Analytica is it doesn't need to make money because it's Robert Mercer's project. Robert Mercer is a billionaire. He doesn't need to make money." Wylie continued, "If you, as an investor of a company, put money into that company, that's not classed as a political donation. You can continue to invest purposefully in a company so that it can also work for particular entities at a subsidized rate or, indeed, in some cases for free." Wylie explained that ROBERT LEROY MERCER invested significant funds to capitalize CA, "He was putting in $10-15 million U.S. to create an asset that then we were licensing for $50,000 in some cases. That $50,000 — it would have been physically impossible to get the same value and level of service and data for that amount of money in any other way."[15]

Facebook knew about the data extraction. According to Wylie, "Their security protocols were triggered because Kogan's apps were pulling this enormous amount of data, but apparently Kogan told them it was for academic use. So they were like, 'Fine'."[16] However, the data extraction was not for academic use, it was for commercial use by Kogan and CA.

---

[14] *Id*.

[15] *Hearing on Fake News*, Before the Select Committee on Digital, Culture, Media and Sport, House of Commons, Parliament of the United Kingdom (2017-19 Session) (testimony of Christopher Wylie).

[16] *See* Carole Cadwalladr, " 'I made Steve Bannon's psychological warfare tool': meet the data war whistleblower," *The Guardian* (March 18, 2018), https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.

Facebook first learned that the data extraction was not for academic use when the Guardian published its first report about CA acquiring Facebook data and using it to support Ted Cruz in his campaign to be the United States Republican presidential candidate.[17] The Guardian published this report in December 2015, but Facebook failed to take action until months later, "And then, all they did was write a letter," which Wylie received in August, 2016.[18] "Facebook lawyers wrote to Wylie, who left CA in 2014, and told him the data had been illicitly obtained and that '***GSR was not authorized to share or sell it***'. They said it must be deleted immediately." (emphasis added).[19]

As far as deleting the data, Wylie told the Guardian, "'I already had. But literally all I had to do was tick a box and sign it and send it back, and that was it,' says Wylie. 'Facebook made zero effort to get the data back.' There were multiple copies of it. It had been emailed in unencrypted files."[20]

A spokesperson for Facebook told the Guardian, "If these reports are true, ***it's a serious abuse of our rules***. Both Aleksandr Kogan as well as the SCL Group and CA certified to us that they destroyed the data in question." (emphasis added).[21]

Mark Zuckerberg, Facebook's CEO, admitted in an interview on CNN on March 21, 2018, "This was a major breach of trust, and I'm really sorry that this happened. You know, we have a

---

[17] Ben Jacobs, "*Ted Cruz using firm that harvested data on millions of unwitting Facebook users*," the Guardian (December 11, 2015), https://www.theguardian.com/us-news/2015/dec/11/senator-ted-cruz-president-campaign-facebook-user-data.

[18] Carole Cadwalladr, " 'I made Steve Bannon's psychological warfare tool': meet the data war whistleblower," *The Guardian* (March 18, 2018), https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.

[19] *Id*.

[20] *Id*.

[21] *Id*.

basic responsibility to protect people's data and if we can't do that then we don't deserve to have the opportunity to serve people."[22]

Christopher Wylie's public statements, and the subsequent public statements by implicated parties, triggered the filing of several lawsuits throughout the country. While the claims differ between the cases, and defendants named differ slightly, each suit names Facebook, Inc. and Cambridge Analytica, each suit arises from common facts, and each seeks certification of a similar class of affected consumers

## III. LEGAL STANDARD

Transfer and consolidation is appropriate when actions pending in different judicial districts involve similar questions of fact such that consolidating pretrial proceedings would, "promote the just and efficient conduct of such actions."[23] In relevant part, Section 1407 provides as follows:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.[24]

## IV. ARGUMENT

### A. THE LITIGATION SATISFIES THE REQUIREMENTS FOR COORDINATION OR CONSOLIDATION AND TRANSFER UNDER 28 U.S.C. § 1407

Pretrial consolidation under section 1407 is appropriate and necessary here. The Actions

[22] *See* Danielle Wiener-Bronner, "Mark Zuckerberg has regrets: 'I'm sorry that this happened'"CNN (March 21, 2018), http://money.cnn.com/2018/03/21/technology/mark-zuckerberg-apology/index.html.

[23] *See* 28 U.S.C. § 1407.

[24] *Id.*

involve common facts, common defendants, and each seeks certification of a similar class of affected consumers. There are likely to be similar tag-along cases filed before the resolution of this case. Unless these cases are coordinated or consolidated, the parties will incur excessive costs due to duplicative discovery and will face the risk of inconsistent rulings on a variety of issues.

### B. THE LITIGATION INVOLVES COMMON QUESTIONS OF FACT

In assessing the appropriateness of coordination or consolidation under Section 1407, the Panel looks to the pleadings to determine the extent to which common questions of fact are present. The Complaints in these cases clearly present common questions of fact. Each Complaint is based on allegations that Cambridge Analytica surreptitiously collected Facebook user data without authorization. In addition, the Complaints all seek certification of a national class. This Panel has consistently consolidated consumer class actions that involve common questions of fact and propose a national class. "[A] potential for conflicting or overlapping class actions presents one of the strongest reasons for transferring such related actions to a single district for coordinated or consolidated pretrial proceedings which will include an early resolution of such potential conflicts."[25]

### C. TRANSFER WILL PROMOTE THE JUST AND EFFICIENT CONDUCT OF RELATED ACTIONS

Transfer and consolidation of the Actions would promote efficiency and minimize the potential for duplicative discovery.[26] Because each Action is based upon the same facts, plaintiffs in each of the actions are, in turn, likely to seek overlapping discovery.[27] The Actions are also

---

[25] *In re Plumbing Fixtures*, 308 F. Supp. 242, 244 (J.P.M.L 1970).

[26] *See, e.g., In re Foundry Resins*, 342 F. Supp. 2d 1346, 1347 (J.P.M.L. 2004).

[27] *See In re Auto Body Shop*, 2014 WL 3908000, at *1-2 (J.P.M.L. 2014) (noting that transfer and consolidation were appropriate to eliminate duplicative discovery when the actions shared a common factual core); *see also, In re Am. Family Mut. Ins. Co. Overtime Pay Litig.*,416 F. Supp.

likely to involve complicated technical issues regarding the computer code behind the collection of user data that may require in expert reports and hearings. Should expert evidence be needed, therefore, these issues would be more efficiently handled in a consolidated proceeding.[28] Similarly, plaintiffs in each Action are likely to seek to depose many of the same witnesses, which again favors centralization.[29] In light of these considerations, transfer of common actions to a single court is likely to promote the interest of judicial economy and efficiency.

### D. Texas is the Most Appropriate Forum

In determining the appropriate forum for related Actions, the Panel may consider several factors: the location of the parties and evidence, and the resources and experience of the transferee court. Here, these factors favor transfer to the Southern District of Texas. This case involves entities and persons spread across the nation. Facebook, Inc. is headquartered in Menlo Park, California and has a significant presence in Austin, Texas.[30] Cambridge Analytica maintains offices in London, New York City, and Washington, D.C.[31] These defendants, common among

---

2d 1346, 1347 (J.P.M.L. 2006) (directing centralization "in order to eliminate duplicative discovery; prevent inconsistent pretrial rulings, particularly with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary").

[28] *See, e.g., In re Natrol, Inc. Glucosamine/Chondroitin*, 2014 WL 2616783, at *1 (J.P.M.L. 2014).

[29] *See, e.g., In re Auto Body Shop*, 2014 WL 3908000, at *1 (J.P.M.L. 2014) ) (transfer before a single judge was beneficial because he or she could "structure pretrial proceedings to accommodate all parties' legitimate discovery needs while ensuring that common witnesses are not subjected to duplicative discovery demands"); *In re Enfamil Lipil*, 764 F. Supp. 2d 1356, 1357 (J.P.M.L. 2011) ("Centralizing the actions will allow for the efficient resolution of common issues and prevent unnecessary or duplicative pretrial burdens from being placed on the common parties and witnesses.").

[30] *See* "Facebook HQ," Facebook, Inc. (accessed March 28, 2018), https://www.facebook.com/Facebook-HQ-166793820034304/; *see also* "Facebook Austin," Facebook, Inc. (accessed March 28, 2018), https://www.facebook.com/facebookaustin/.

[31] *See* Cambridge Analytica (accessed March 28, 2018), https://cambridgeanalytica.org/.

the Actions, are equidistant to the Southern District of Texas, and Houston, Texas is home to an international airport that makes it easily accessible by flight.[32] Houston is also the fourth largest city in the country and regularly hosts significant events, such as the Super Bowl in 2017. There are more than a dozen hotels within a six block radius of the courthouse. This central location will split the difference between Defendants and will not favor or give advantage to either party. Additionally, the Southern District of Texas has experience with multidistrict litigation and the necessary expertise to adjudicate this case.[33] The Judge assigned to this case, the Honorable Keith P. Ellison, has been serving on the bench since 1999. He has experience with complex litigation, including multidistrict cases.[34]

## V. CONCLUSION & PRAYER

Accordingly, Plaintiff Matthew Lodowski respectfully requests that the Panel grant his Motion and transfer the Actions to the Southern District of Texas, Houston Division for coordinated or consolidated pretrial proceedings.

Respectfully Submitted,

**HUGHES ELLZEY, LLP**

*/s/ W. Craft Hughes*
W. Craft Hughes
Texas Bar No. 24046123
Jarrett L. Ellzey

---

[32] *See In re: Sigg Switzerland (USA), Inc., Aluminum Bottles Mktg. & Sales Practices Litig.*, 682 F. Supp. 2d 1347, 1349 (J.P.M.L. 2010) (selecting the transferee court because, "This district offers a relatively geographically convenient location for this litigation that involves four purported nationwide class actions."); *See also In re: Yamaha Motor Corp. Rhino ATV Prod. Liab. Litig.*, 597 F. Supp. 2d 1377, 1379 (U.S. Jud. Pan. Mult. Lit. 2009) (choosing forum for its central location).

[33] *See In re Enron Corporation Securities, Derivative & ERISA Litigation*, MDL No. 4:02-MD-1446; *see also In re Silica Products Liability Litigation*, MDL No. 2:03-MD-1553.

[34] *See e.g. In re: BP p.l.c. Securities Litigation*, MDL No. 2185.

Texas Bar No. 24040864
2700 Post Oak Blvd., Ste. 1120
Galleria Tower I
Houston, TX 77056
Phone: (713) 322-6387
Fax: (888) 995-3335
craft@hughesellzey.com
jarrett@hughesellzey.com

**ATTORNEYS FOR PLAINTIFF MATTHEW LODOWSKI**

**PROOF OF SERVICE**

I certify a copy of the foregoing document was electronically filed with the Clerk of this Court using the CM/ECF system in accordance with the protocols for e-filing in the United States District Courts, on March 30, 2018, and will be served on all counsel of record who have consented to electronic notification *via* CM/ECF.

*/s/ W. Craft Hughes*
W. Craft Hughes